I'd like to do something a little different, I want to ask the government a couple of questions first and then we will proceed with argument. We will not have argument for you. We just want to ask a couple of questions for the record. I want to make sure that we have good sense of the record and then we'll come right back to the appellant. So we're not going to start the clock yet. There was a 28 J letter that was submitted by the defense and it appended a letter that the U.S. Attorney sent on December 1st, 2022. It's not really a 28 J letter. 28 J letters raise new authorities. This is I think more in the nature of a motion to supplement the record, but of course it's not really, these are not reflective of matters that occurred before the district court, the proceedings that are currently in appeal. But I think two questions. Number one, is there any objection by the government in our panel considering the statements that were placed in the government's letter dated December 1st? Your Honor, there's no objection to the panel considering it. We have reasons why we don't believe it really bears. No, no, no. So let's just take this one step at a time. Does the government have no objection to our panel considering it to the extent that we deem it relevant? No objection to that. The second question, is there any further information that the government has regarding this call that was not placed in that letter? Let me start there. No. Is the government aware of any other ex parte communications between the district court and the United States Attorney's Office in this case, whether during this phone call at any other time during this litigation? I am not, Your Honor. Has counsel who's here today had conversations with the other AUSAs in the matter who represented the government in this case such that you would have a basis for answering that question completely? So I've discussed the case with the AUSA who received this call. I confess I have not specifically said were there any calls. I think by the nature of our communications, it was clear that this was an unusual and surprising and frankly unwelcome event. And so I think from those conversations, it naturally would have emerged if there were other conversations. I have not been in touch with AUSAs who have since left the office who are involved with this case in the district court. Okay. I just wanted to get some of the factual basis so we have an understanding as we proceed with the arguments. Just let me ask fellow judges if there's any other factual questions regarding the record. Okay. Then why don't we proceed as we would normally do. We'll proceed with the appellant first. Thank you and good afternoon, Your Honors. Noam Beale on behalf of defendant appellant Jonah Recknitz. Your Honors, as stated in the government sentencing submission in this case, Mr. Recknitz is one of the most important cooperators, white collar cooperators in the Southern District in recent history. He began cooperating now over seven years ago. He sat for over 80 proffer sessions with the government. He testified in three trials and he endured not only withering cross examination, but also harassment from the media and the community. He more than anyone wants to put this matter behind him and turn to the next chapter in his life. But cooperating defendants, like any parties before the court, are entitled to an impartial tribunal and for decisions made in accordance with the law. And on the two issues that we have raised in our brief, that did not happen here. As noted in our reply, we have withdrawn issue three in our principal brief, so I'm only going to talk about issues one and two. On issue one, which is the recusal issue, vacater and remand to a different district court for resentencing is warranted. It's necessary here, Your Honors, based on 28 United States Code Section 455A, 455B1, and 455B53. The principal reasons are the following. The court's close filial relationship with an individual, Andrew Kaplan, who played a role in the charged conduct and who had an interest in the outcome of the restitution proceeding by virtue of the mandatory restitution obligation that would be imposed under the statute to the same victim. Could we again ask, let me get some points of factual clarification to be helpful. Number one, what is the status of Mr. Kaplan's criminal proceedings, if you're aware? He has not been sentenced yet. Do we have a date scheduled? There is not because, as Your Honors may be aware, because this case has come up to this court and come back down. All I need to know is whether there's a schedule. The answer is not as far as I know. I spoke to Mr. Kaplan's attorney, and so the information I have is from him. He didn't mention any sentencing date. Okay, and obviously to the extent I'm asking you for any of these factual data to help us decide, to the extent when it's the government's turn to respond, if you have any different information, we'd expect you to flag this. The second question is, do you know whether COBA has submitted a request for restitution in Mr. Kaplan's case? I do not know. You don't know? Mr. Kaplan's case is not on the public docket as of yet. Okay, so you don't know. So I don't know. My only question is what's within you. Scoping for knowledge, you know, appreciate the government's statement one way or the other as to whether they know. Okay, that's it. Go ahead. Thank you, Your Honor. If you could focus, are you objecting or are you saying that this fits under 455A, 455B1, 455B5? Where does the injury that you are alleging fall under in terms of disqualification? I mentioned those three provisions of the statute because I think they're all implicated by what happened in the district court proceedings here. I don't think the court needs to reach all three. I think that the court would be comfortable sending this back under 455A because the combination of facts here at least creates reasonable concern that an objective observer would question the impartiality of the district court. That's all that's required under 455A. And as this court and the Supreme Court have made clear, the statute, that provision of the statute deals with appearances. And I think here we have a clear appearance of partiality based on all of the facts that we set forth in our brief, and I'm happy to go through more of them. Well, B5, three of four, don't apply in their own terms because it only applies to a person within the third degree of relationship. And conceitedly, this is, Mr. Kaplan is not a person of that sort, no blood relation. I understand why you would make an argument by analogy saying that the relationship is so close as to be indistinguishable for material purposes under B, three of four, that it would trigger 455A. I understand that argument, that if someone is tracking perilously close to some other 455B, that can create an appearance of impartiality. But are you also arguing that he is, in fact, a person within a third degree of relationship? No, I think that's right, Your Honor. I think from what the district court said, he's someone who was, or the district court treated- He is, in fact, within the meaning of the 455B, a person within the third degree of relationship. That's not my argument, and I don't think that the court needs to go there. I would just note that in one of the cases that we cited to the court, in Ray Faulkner, which is a Fifth Circuit case, the Fifth Circuit did focus on the fact there the relationship was between the judge and a cousin, and the circuit said, but they were close enough that it was really like a brother-sister relationship. So that is a factor that the courts have looked at, but you're right, Your Honor, it's within the context of what is the appearance here. And again, I don't think this court needs to go beyond 455A and the appearance of partiality caused by all of these. Can I ask you, in your view, do we have a full enough view of what the facts are in terms of the discussions that did take place between the district court and Mr. Kaplan? My understanding of what we have in the record is that there's the letter from Huberfeld's attorney, Mr. Kelly, to the district court saying it's come to our attention only now that there was a sidebar colloquy with Seabrook's lawyers that nobody was aware of except for Seabrook's lawyers, and that it had come to Mr. Kelly's attention from talking to two other individuals who had talked to Kaplan that there was, for example, more than one conversation between Kaplan and the district court. Various things were discussed. The district court's ruling on the reassignment motion seemed to address some, but not all of the facts that were contained in Mr. Kelly's letter. Is it your view that we have enough facts to decide this issue one way or the other? I do think this court has enough facts for a couple of reasons. One, specific to the point about those discussions, what the district court said is I discussed with him his options about the investigation of Platinum Partners and what he should do. Based on those discussions, the district court advised him to plead guilty and cooperate in the- Did he say that I advised him to plead guilty or I advised him on whether? I think that's very wrong. I don't have that in front of me at the moment. I think what the district court said in the proceeding with Seabrook's counsel, which was initially in an off-the-record conversation and then the parties urged the court to put it on the record, was simply about the district court's relationship with Kaplan's parents. And that's at page 261 of the record, which is the Huberfeld letter. The district court didn't disclose at that point its close relationship with Kaplan, the sort of like-a-father, like-a-son relationship. That only came out after once Mr. Rechnitz raised concerns to the district court about the district court's ability to fairly adjudicate the restitution issue. And so all of the information that we have- That appears in Mr. Kelly's letter, correct. And then the district court confirmed that. I'm saying that the information that we have from the district court, the further information about the relationship with Kaplan and the discussions about whether Kaplan should plead guilty and cooperate in the Eastern District Platinum Partners case, those come from the district court's responses to Mr. Rechnitz's motions on this issue. Which is in part redacted, but he says, Kaplan's father, who died more than ten years ago, was my close friend and his family and mine have been close for 55 years. I told his son after his father died that I would be available to him to discuss any problem he might have as if I were his father. When Kaplan was indicted and was offered a plea in exchange for his cooperation, he came to me to help me think through his options. And then he goes on to, there's something redacted. I know we have the unredacted version, but for purposes of today, I'm not asking you about that. There's a lot in here about discussions between the judge and Kaplan, Mr. Kaplan. There's also an acknowledgment by the judge that Mr. Kaplan spoke about Mr. Huberfeld, who your client dealt with. There was a reference in the record to an email between your client, Mr. Rechnitz, and Mr. Kaplan. During the trials he testified, were there questions put to him or any testimony elicited about your client's interactions with either Mr. Kaplan directly or about Mr. Kaplan through Mr. Huberfeld? So, Your Honor, there was testimony by my client about discussions that he had with Mr. Kaplan at the time COBA's initial investment in Platinum Partners was made. So there was there was testimony about that. There was a government exhibit, which was this email exchange. And there was testimony by my client about Mr. Huberfeld essentially scolding Kaplan for having a conversation with the pension fund's institutional advisor about the investment and saying that they should cut that person out of the discussions. So that was the nature of the testimony. And by institutional investor, you mean COBA? I mean COBA's advisor, whose name was Tommy Reynolds. Correct. Yes. You said institutional investor, and I want to be clear. There may have been other institutional investors in the hedge fund, but you were specifically referring to COBA. Correct. Correct. And if I can just come back to Judge Nardini, your question about whether there are more facts needed in the record about these conversations. So, first of all, I would just point out that the district court stated, I don't have any extra judicial information about the facts, and we didn't have a discussion about the law that relates to the Platinum Partners issue. Now, I would just point the court to the Supreme Court statement in Lilleberg, which is the Supreme Court's sort of foundational decision about these kind of recusal issues. The Supreme Court said the problem with a district court simply disclaiming knowledge or disclaiming prejudice is that what's in the district court's head is not an ascertainable fact to an objective, reasonable observer. And the inquiry is whether, based on the facts that are available, would an objective, reasonable observer question the impartiality of the district court. And so I think that based on the existence of the conversations, even without knowing the specific substance of the conversations, combined with the other factors here, which include the district court's failure to disclose this issue to Mr. Rechnitz, even while the question of Platinum Partners and Kaplan's role became sort of central to the restitution issue, the district court's punitive treatment of Mr. Rechnitz after he raised the recusal motion, which required this court to issue a writ of mandamus, ordering the district court to vacate one of its orders. The reasons the district court stated on the record at 3.20 of the appendix and in its written decision at Special Appendix 9, that it was factoring in the fact that Huberfeld was not going to end up covering the difference in the restitution as it had assumed based on this court's vacating of Huberfeld's restitution order. And then finally, of course, the issues raised in our 28J letter, which I take Your Honor's point, there's not a clear vehicle for raising those issues to the courts. But I think there- Let's say we can consider it. Let me ask you about that. It's, these are, this is a phone call that happened during the pendency of the appeal. So after jurisdiction, at least temporarily, has been transferred to this court. What is your view on how, if at all, this additional information reflects on one of the decisions of the district court now under review, which was his prior decision not to reassign the case? So, a couple of ways, Your Honor. I think, first of all, what's concerning about the conversation, just putting aside the fact that it's an ex parte call to one of the parties, is the- And on the record. Correct. Is the personal disparagement of Mr. Rechnitz and the way in which the district court denigrated Mr. Rechnitz's religious faith in the conversation with the assistant U.S. attorney, I think bespeaks at least an appearance of bias or prejudice. So that weighs into the section 455A analysis. I think the fact that the district court complained to the assistant U.S. attorney about some of the conduct of Mr. Rechnitz, not related to the restitution issue, but related to travel requests- What do you think of the district court's apparent request to the AUSA not to speak to opposing counsel after the AUSA had quite appropriately appeared to respond to the district court's ex parte off-the-record request for information by offering to ask, I suppose, you or whoever was representing Mr. Rechnitz to make a formal submission to the court, which would be on the record. And the district court responded by asking the AUSA not to speak to counsel about this, his counsel, Rechnitz's counsel, and instead advised the AUSA to find the information from the clerk of court. What do you make of the district court's specific request to keep the ex parte conversation ex parte? So I was about to get there. I think that that is troubling, simply on its own. Have you ever encountered such a situation before? I have not. I have not. I've never had this kind of situation. I would be asking the government, obviously, the identical question. And I think that part of what's concerning about it here, Your Honor, is that it was part of a pattern of nondisclosure of issues related to the restitution inquiry to Mr. Rechnitz. I can understand why, when Mr. Rechnitz was testifying at trial, the court didn't feel that it had to disclose, you know, at a sidebar with Mr. Rechnitz's counsel that he knew Kaplan at that point because it had been disclosed to the government and to Mr. Seabrook. But once the conduct of Kaplan and others at Platinum Partners became central to the restitution issue, which Mr. Rechnitz raised at his sentencing and then again on remand after Koba's mandamus petition came before this court, I think it was incumbent on the court at that point, sua sponte, to raise before the parties there is this issue. If you have concerns about it, let's hash it out. Can I? Oh, please finish. I do have a question. I was just going to finish. That only happened because I noticed that Huberfeld's case had been reassigned  I called the assistant U.S. attorney who was on the case at that time and asked about it, and the U.S. attorney's office then disclosed the Huberfeld letter to me. So that's the way that this issue came about. Am I correct? I should know this. Is your client, was he charged as a co-conspirator with Mr. Huberfeld? Yes. So the district court recused itself from one co-defendant's case and did not disclose the matter to a fellow co-defendant, but you were watching the docket, you learned, and when you inquired of the government, the government told you. That's right. I'm sorry. Judge Nardini. So, and to follow up, if you could just concisely explain, your argument, which I understand, is any dollar your client pays in restitution is $1 less, you claim, that Mr. Kaplan might owe if and when he is sentenced and what that restitution order might be. The government makes the claim, well, the restitution is separate because the alleged victims in the Kaplan prosecution were separate from the alleged victims in the COBA investment. And what is your, if you can concisely respond to that. Sure. So the government makes this argument that there is no evidence in the record that COBA was one of the investors or prospects that Kaplan testified he lied to in the course of the Platinum Partners conspiracy. But if the court looks at the excerpt of Kaplan's testimony that we've included, which is, I'm sorry, it's at the very end of the record, it's page 356 of the record. The very next question interposed by the assistant U.S. attorney in the Eastern District is, in what fund, and he says in the PPVA fund. And it's undisputed here that COBA's money was invested in the PPVA fund. And as a result, the securities fraud that occurred that caused losses to the investors in that fund will trigger mandatory restitution obligations to the investors in that fund, which will include COBA. And the reason that we say. In other words, co-conspirators or fellow defendants convicted of the same securities fraud scheme are not limited in their restitution obligations just to the specific people to whom they personally lied. That's right. They can have scheme liability or conspiratorial liability determined by the district board. And we cited cases in our reply brief showing that even pre-existing investors, if their money is kept in while relevant information is concealed about the state of the fund, they may be victims under the Mandatory Victims Restitution Act as well. I may have asked this question, or maybe I'm asking a slight variation. I think I asked before, has COBA sought restitution in Mr. Kaplan's case? Are you aware of whether COBA has asserted a claim for restitution against any of the defendants as to whom Mr. Kaplan is a co-defendant? I don't know the answer to that question. Okay, so maybe the government, if you know that, that's helpful. If you don't know that, that's fine. I think, though, I would just add, I'm not sure that that takes care of the appearance of partiality. No, I understand. If we don't know, and the district court didn't know, but there's a possibility, I think that creates an appearance of partiality that is- No, that goes to substantial interest under 455B, whatever the number is, 45. 35, I think, right. I do want to address the restitution issue. If the court would prefer I can use my rebuttal time for it. Why don't you take two minutes to talk about that? Sure, Your Honor. Briefly, let me just say first the essential facts as to this issue are undisputed, and the government acknowledges that on page 39 of their brief. The district court actually refused to consider the superseding cause of the Platinum Partners fraud when it was raised at sentencing, saying to defense counsel, there's no evidence in the record here of what caused the loss. It's simply, all I know is that COBA lost the money. Now, putting aside the fact that the judge did have some information about the Platinum Partners fraud, the court simply refused to consider that this separate intervening fraud could break the chain of causation, and instead relied on essentially three variations of an argument with respect to restitution. First, there's the district court statement that a bribe closes the eyes of the wise, and so anything that happens after a bribe occurs may be attributable to the person who facilitates the bribe or the briber. I do want you to finish your thought, but I'm hoping you can fold into this a disagreeing position, which would be the idea that your client could have foreseen that setting up Seabrooks to take kickbacks meant that COBA would bypass its usual due diligence process. Right. So, yes, I will get to that. I think the fundamental problem, I think, with the court's reasoning is that there's really no limiting principle to it. The court's reasoning that the bribe closes the eyes of the wise, and so anything that occurs after that point- Well, it's not anything. Which was not- It's just, if it creates an incentive for someone to invest without doing due diligence, it's creating a zone of risks as to whether the thing that would be uncovered by due diligence won't be uncovered. It's not saying anything that follows. It doesn't say that if the person who gets the bribe buys a Ferrari and then drives recklessly and then hits somebody in the highway, you're liable for the death, right? It's not anything. It's very specific. Right, and the court said that it's- the court addressed that, the district court, by saying the loss at COBA was a financial loss, which is inherent to any investment, and that's within the zone of risk. The problem, I think, with that reasoning is this was a very different cause of the loss than the type of typical, reasonably foreseeable risk that adheres in an investment. And we would have a very different case, Your Honors, if the bribe had been undertaken, the money was invested in the hedge fund, and then because of the hedge fund's risky investing, the investment went to zero. Even if Mr. Rechnitz had no awareness of the investment strategy and expected that the investment would do well, I think clearly that's within the zone of risk that Judge Perez, you're describing, the failure to do due diligence, and the kind of risk that's inherent in moving money from whatever safe investment vehicle it is, an index fund, something like that, into a more risky hedge fund. What is not reasonably foreseeable, and certainly there is no evidence presented here that would meet the preponderance standard, was evidence that it was reasonably foreseeable that there would be fraud internal to the hedge fund that would cause the total collapse of the hedge fund. Unless you think it should be reasonably foreseeable that if a guy who runs a hedge fund is willing to pay bribes to get people to invest, then he's probably a shady character who commits all sorts of other crimes. That's right. And COBA, I think, states that argument well in their amicus brief. They say essentially it's a suspect fund if they're willing to pay bribes to get investments. I think there's two problems with that argument. One, it similarly lacks a limiting principle. Maybe the Ferrari example would not be approximate cause, but you can imagine someone who's willing to bribe someone might be willing to extort someone, might be willing to do any number of other criminal acts. The other problem with it is I think that runs headlong into this court's holding in Goodrich. In that case, the government argued that the losses to victims of a private placement scheme were reasonably foreseeable to the defendant who was a participant in a public market manipulation within the same investment fund. And it was essentially the same kind of argument. If they're willing to engage in a public market manipulation, it's likely that the people in the private placement fund are also being defrauded. This court said that that's not enough. You need some evidentiary link from one to the other. You cannot simply assume that because there's some criminality in one aspect of the fund that any bad thing that happens is going to be attributable to the defendant. And here there is no such evidence. All of the evidence, in fact, that the government put into the record weakened the link. And it's described, Your Honors, in pages 135 to 136 of the record where the government lays out very clearly why it was not reasonably foreseeable to Mr. Rechnitz that this kind of event, this fraud, would cause the losses to COBA. And I think this court's ruling in Goodrich makes it clear that that kind of evidence is needed to establish proximate cause. I appreciate the court's indulgence. I'll reserve the rest of my argument for rebuttal. Okay. Thank you. Let's hear from the government. And, counsel, I know that this will be obviously a very uncomfortable series of questions that we've been asking. And in no way does it seem to appear to reflect on what the government – how the government has conducted itself. But, nevertheless, it's a series of uncomfortable things. The first question I just want to ask out of the gate is, subsequent to the filing of the briefs, we have the 28J letter based on the information that the government disclosed to the defense. Has the government altered its position in any way on the question of whether reassignment was or should be either reconsidered? Was it appropriate or it ought to be – how it ought to be viewed by this court? Thank you. May it please the court, in this – for the issues raised in this appeal, no, it has not altered our judgment that – our opinion that the judgment should be affirmed. And if I could just explain some of that. Please do. On the recusal analysis, it is, of course, an abuse of discretion standard of review. I think there needs to be an indisputable abuse of discretion, the court has said. And, of course, here, the district court has not had a chance to weigh in on these comments, has not had a chance to weigh in on the disclosure and on what those comments may mean. And so, I just – Well, let me ask you, are you suggesting that the inappropriate course of action for us would be, what, a remand for the district court to explain why it had an ex parte conversation with one party and instructed that party not to inform the other side of that? So, I am not suggesting that. And if I could just explain why. Because I don't know what to make of this. I mean, I've never seen anything like this. And I don't know if, in your experience, you ever have. I hope not. No, no. This is extremely unusual. And, as I said, it's not something we welcome. And, as Your Honor noted, it puts the government, frankly, in a terrible position. I do want to – I think it would be helpful if I provide just a little bit of context about the call. And my goal is not to defend some of the aspects of it that I think we all agree are troubling, but so much as just to explain why there may be a little more information to be had here. And then I can just get into my position on the remand question. So, this is maybe a little bit clear from the 20HA letter and the disclosure. This call was made at a time when Mr. Recknitz was submitting a series of travel requests, which he is, of course, permitted to do. There have been, if you look at the docket, there have been travel requests dating back for a year plus, a string of them. And on the day of this call, November 15, 2022, counsel for Mr. Recknitz submitted a letter noting that Mr. Recknitz was in Dubai on a business trip, which was authorized. He wanted to extend that with a stopover to Israel to conduct further business. That's a docket 183. The day the call was received, and before that was disclosed to the defense counsel, there was an order from the district court granting that request, that's docket 184, and commenting that the frequent foreign travel may be inconsistent with Mr. Recknitz's status, which I think echoes some of the comments that are reflected in the notes from that ex parte call as well. And so the context I'm trying to convey there is that it's certainly not unusual, although the manner in which the judge expressed this to the AUSA was unusual and inappropriate, it's certainly normal to question frequent travel requests that involve international travel, that involve a defendant who's on bail pending appeal and has been sentenced to some term of incarceration. And that may also explain why restitution was mentioned during this call. These travel requests appear to be business related, and so it may naturally raise the question, well, okay, if he's conducting all of this business, has restitution been paid? I just also want to address the comment about religion. And again, I agree that, I think we all agree that from the call that there are certainly troubling aspects of that statement. But just for a little context of what potentially may have been happening there, there has been a theme in this case brought up by Mr. Recknitz himself, that there is a tension between Mr. Recknitz's criminal conduct over years and his religious observance. And so Mr. Recknitz himself said at sentencing that he called himself, quote, a big hypocrite to my religion. He said he expressed shame for, quote, desecrating my religion. That's at page 224 of the appendix. And the district court at sentencing kind of raised the tension between the good and the bad that Mr. Recknitz had done and said, how could you square both? This was at page 230 of the appendix. And so again, I'm communicating that just to convey that there has been a theme in this case. Then why not deny the travel requests? Just deny it. If you don't think they're legitimate. And the question I have is, once the judge makes the decision to recuse himself from Mr. Huberfeld's case, how does that not create an appearance of impropriety with respect to not recusing himself from the co-conspirator case? I think there are two major reasons why the recusal decision with respect to Mr. Huberfeld was different from the recusal decision with respect to Mr. Recknitz. First, just as an initial matter, we agree that disclosures should have been made to Mr. Recknitz at the time they were made to other parties and certainly to Mr. Seabrook. If I can hit the pause button on that. And I agree, it certainly is clear that the district court should have made that disclosure. I am wondering why it never occurred to the government at the time the disclosure was made to Seabrook. And maybe it's just because it was busy and it was in the middle of trial and everyone's running around. But why, at that time, was that disclosure not made simultaneously to the co-defendants, Huberfeld and Kaplan, by the government? And, Your Honor, I don't have an answer for that. Okay. See, I'm struggling with, once a judge, and this relates to the highly deferential standard. I get that it's a highly deferential standard for judges to assess whether they have an actual conflict of interest or the appearance of a conflict of interest or impropriety in sitting on a case. But once a judge makes a decision that he or she should not sit on a case and there are more than one co-conspirator charged in the same offense, and that decision relates to knowledge of yet another co-conspirator charged in a different jurisdiction with, in essence, the failure of the same hedge fund, how does that not create an appearance of impropriety and the same judge not recusing himself or herself in the co-conspirator's case? Well, Your Honor, I think it is fact-specific. And so there just are, I think, two key distinctions with Mr. Huberfeld that are not present with Mr. Reckles. The first is that what we've called the Huberfeld letter, this was the letter from Huberfeld's counsel that was submitted to the district court that highlighted information it had received about, I guess, statements that Kaplan had made. That letter highlighted that Kaplan had, quote, very strong negative feelings toward, generally, the leadership at Platinum at the hedge fund, the top executives. And the letter, I think, made clear that that necessarily included Huberfeld, who was a co-founder of Platinum, which is where Kaplan worked. So how does that not spill over to a co-conspirator in that same, you know, if the concern of the judge is, hey, I have information that Huberfeld's a bad guy and he's responsible for this scheme, if you will, how does that not spill over to the co-conspirator who arranged, solicited a bribe to invest in that same scheme and who the judge believes should be responsible for the entire loss of that scheme? I think there's a world where it could spill over. But I think in this case, the distinction is that there was a specific allegation that Kaplan had personal animus toward Huberfeld, who he worked with at Platinum. Recknitz was a co-conspirator of Huberfeld's but did not work at Platinum. And although there are communications that are in the record, there's an indication that, you know, between Recknitz and Kaplan, there's no indication that there was any animosity between them. There's no indication that there was anything, frankly, significant. You're not establishing or you're not suggesting that we established we had to prove animosity. I mean, why wasn't it as simple as saying he wanted to protect his son or someone who was like a son to him? I'm sorry, with respect to recusing himself in Huberfeld? Yes. So, right, I'm not suggesting you have to establish animosity. But what I'm saying is that the decision to recuse from Mr. Huberfeld's case, I think, was tied, one, to this letter that specifically said that Kaplan disliked a group that includes Huberfeld and that would not include Recknitz. And, two, that I think in response to that letter, you know, one thing judges need to balance in these recusal decisions is avoiding waste and duplication. That's the Robin case, the en banc court from 1977. That's this court sitting en banc. And it is very different. Of course, if the judge has a conflict, he has to recuse no matter what. But it could be that on balance he says, look, there's an allegation of personal animosity, and it is much easier to assign the Huberfeld resentencing than it is to reassign the Recknitz restitution proceedings because the Huberfeld resentencing, remember, was very limited. It had already come down on remand from this court, and it was already determined that it was going to be a resentencing with a $60,000 loss amount, a $60,000 restitution amount for a crime that was just based on the payment of the, not for the NICS ticket, but the reimbursement of the bribe. So you're suggesting that the judge who gets this on reassignment doesn't have to analyze the case, study the case, and I don't see how waste, much more wasteful it would be to send, instead of one defendant, two defendants. I mean, once you learn about the scheme and what was each individual pled guilty to or was convicted of, how much more work is that going to take? Yeah, and on that same point, considering these are co-defendants, I don't know how the related case policy works in your district, but wouldn't, as a matter of course, this case, the Recknitz case, probably have been assigned, designated as a related case to the Huberfeld? I mean, maybe it would, maybe it wouldn't, but it seems like that would, as a matter of course, be achieved. So there would already be economies of scale, if you want to call them that. Plus, we are talking about the very tail end of the Recknitz case, right? He's already pled guilty. He's already been sentenced. I understand he's not moving to vacate his plea. I understand he's not moving to upset any other aspect of his sentence. We're only talking about the restitution issue, and as near as I can tell the only thing we're talking about now is proximate cause, right? Yes, Your Honor. So the issues have been considerably narrow. I understand it's not the easiest case. It's not a question of was it raining or was it a sunny day, but we're not talking about reinventing the universe. That's correct, Your Honor, although I think in deciding that restitution issue, there were a lot of facts to consider, facts that came out through Mr. Recknitz's testimony at the Siebert trial, whereas with Mr. Huberfeld, he had, remember, his guilty plea was not to the overall bribery scheme. It was to this very discreet single payment, this wire fraud against platinum, and that, frankly, was much more cabined, I think, than resolving the restitution issue. Well, I understand that, and often that's part of the plea bargaining that, hey, you're going to, instead of pleading to, you engaged in this bribery scheme, you handed a check, the first installment of the bribe. But it's still, you have to understand the scheme, you have to understand the surrounding circumstances if you're a judge imposing a sentence or imposing restitution as it relates to that. You still have to address the alleged victims of this scheme. So how, I still, I don't see how it's going to save the judge anytime, the judge who's assigned this, anytime by having both defendants versus just Mr. Huberfeld. Well, it's actually different victims of, because Mr. Huberfeld pled guilty to this $60,000 fraud where platinum was the victim, it's different from Mr. Rechnitz's case where, first of all, he's pled guilty to sort of a broader scheme that even extends into the NYPD conduct that was subject to a different trial with other defendants, but also the biggest victim is Huberfeld. Which would suggest the restitution, his restitution and Mr. Kaplan's overlaps. So you see how your argument now is cutting the other way. No, I'm sorry. The NYPD case, I'm talking about the benefits at the parking placards and that sort of thing. Sorry, I thought you were referring to E-D-N-Y. No, no, no. I'm sorry. I'm referring to the other S-D-N-Y case. Can I ask you, shifting back, unless you're not done yet. In terms of 455A and the appearance of impropriety, what are we to make of the district court reaching out to an A-O-S-A? I understand you're saying the substance of these comments in many ways may reflect what the judge has learned in the course of proceedings, views that he has formed in the course of proceedings, and normally had he expressed these on the record at sentencing, for example, we'd say, well, look, they're based on information he acquired. But that these are remarks made to an adverse party, ex parte, off the record, and then the court instructs the A-O-S-A not to inform the other party. Does that not reflect the appearance of impropriety under 455A? Again, I've never heard of such a thing. I think it could reflect on the appearance, Your Honor. But I think that because this is a court of review, it's usually the case that the district judge in the first instance would have a chance to decide whether these facts give rise to the need to recuse. And there are mechanisms to do that. So what would you suggest we do? And so what I would suggest is I don't believe it bears heavily on the restitution question here, which I believe is more based on this idea of a financial interest of Kaplan that might be affected by the restitution determination on Mr. Recknitz. What it seems to raise instead is the question of personal animus or bias. And Mr. Recknitz would have a full opportunity to raise that. But how would you be able to test it realistically? If you're defended, how can you then test for bias? Because obviously we indulge in the greatest deference to the sincerity of the district court's views here. And I don't know that we have any reason to question this sincerity. The question is the appearance of bias. And I think what I'm asking is if we were to send it back to the district court and say, well, what did you mean by this? Why did you do it? That doesn't change what was done and the appearance it creates to the public, even if done with the purest of motives, which we would assume it was. How does it change? How could any—I'll make it up—remit for fact-finding? And, of course, it's very awkward to have a fact-finding by the district court about what he meant or something or put more details on the record of his recollection of the phone call. How does it change the fact that he chose to have an ex parte, off-the-record conversation about the defendant, explaining to the AUSA his views about the defendant, and then specifically asking the AUSA not to reveal it? And then I will say, to the great credit of the AUSA, relatively promptly disclosed it to the defense. Yes, Your Honor, I do think there are cases, and maybe the court thinks this is one of them, where it could be that there's no need to go back for fact-finding, that the court could just say the appearance is too great, whether or not the judge meant something different, and so we can send this elsewhere. I do think here, given the context that I've provided, I do think, and I'll say, I think the least ambiguity in the notes about whether he was saying, don't ask defense counsel for information about how much restitution has been paid, ask the court instead. There might be value in letting Mr. Recknitz bring this up in the district court in the first instance. What would you specifically, how would you, if you're proposing that we would have a remand order, for example, what would that remand order say? So I'm not proposing a remand order. I know, but hypothetically, you have now just suggested that if we were to go to that group, you'd want to allow the defense to explore this. I'm trying to ask concretely, what would that hypothetically look like? I suppose it would ask the court whether this now creates an appearance of partiality that would, that changes the court's view of whether the case should be reassigned. I guess at that point, if it's a question of the appearance of partiality, we're not asking the district court for its internal views about whether it feels animus or whether it feels it couldn't deal with, we're dealing with externalities, right, how these actions will be perceived externally. And I guess what I'm asking is in that situation, when that is the fact, how is the district court in a superior position to a reviewing court to make an assessment of how its judgments will be externally perceived? I think for the sole reason that the court would have an opportunity to explain itself and that that explanation would become part of the record that a reasonable person would have to look at. You know, the standard is a reasonable person who's fully informed of the entire record, and that record would necessarily include, you know, not just Mr. Reknitz's arguments, not just her arguments, but also the district court's own explanations for what it intended. Although it's the government's contention, I believe, and this is where we started, that the letter written by the chief of the criminal division is a complete and accurate statement representing what was said during the phone call. So I would assume that it is not the government's position that there are, in fact, other relevant facts known to the government that need to be added to the record. That is correct. I believe any explanation would go to what the district court intended with its comments. And to be clear, the government's position at the time the letter, at least at the time the letter was written, and I assume that hasn't changed, is that it was of concern enough to the government that it wrote a letter to defense counsel. Yes, that's correct. And that position has not changed? That position has not changed. Of course, we disclose things in an abundance of caution all the time, but certainly in this case there was concern. It is significant that it was signed by the chief of the criminal division, which is not typical of a more mundane disclosure. Okay, I think we have the government's argument. Why don't we hear from the rebuttal committee? Thank you, Your Honors. Briefly, I think that just to pick up on where my friend ended, clearly the government had concerns about the appearance caused by this phone call, and that's why they disclosed the letter. And as Judge Nardini, you pointed out, the relevant question is appearances. The intent of the district judge, whatever he could explain on remand, is not a relevant inquiry, and the Supreme Court's decision in Lilleberg makes that clear. I also want to address, Judge Kahn, your question about the assessment of the district court to whom Huberfeld's case was reassigned. At Huberfeld's sentencing, the assistant U.S. attorney said, you should consider that the fact that the offense of conviction was to mask this whole bribery scheme, and you should consider that at sentencing. And of course, the district judge had reviewed the entire record, understood all the relevant conduct, and fashioned a sentence that was based on the entirety of the record. So I don't think that there's any efficiency advantage to having, or there's no efficiency loss to having that district judge or some other district judge assess the entire record and re-sentence and decide the restitution issue as to misdirected. I do want to clarify, Judge Nardini, I'm not sure if I misheard your question. We are asking that the sentence be vacated here, not just the restitution ruling. You're asking for the entire sentence. Yes, Your Honor. And we raised, so when the issue first came up before the district court, it was in the context of the restitution proceeding. And so what we said in the motion to the district court to reassign the case was, because this issue bears directly on the restitution question, you should reassign the restitution question. Then when we asked for reconsideration, we said, you know, there are issues here that may cause Mr. Rechnitz to ask on appeal for his entire sentence to be vacated. We don't know what they are. But this obviously raises lots of concerns about the appearance of partiality of the entire proceeding. Footnote, it does not implicate Mr. Rechnitz's plea, because that was taken before a different district judge. Before then, Judge Sullivan. Can I thank you for clarifying that? I see that you did ask to vacate the judgment sentence and the restitution order. I did not fully grasp that. Sorry, Your Honor. And I think that the government's argument about the way in which Mr. Rechnitz's religion was a topic of discussion at sentencing makes it clear that the comments that the district court made ex parte to the assistant United States attorney about Mr. Rechnitz's, the sort of veracity of his faithfulness to his religion, that's part of why the entire the sentencing proceeding now is somewhat tainted by this appearance of partiality. However, I would say we asked this court to vacate and send the case back for resentencing before we got the government's letter, because we thought that there was enough in the record about the relationship with Kaplan, about the way in which the district court declined to disclose the issue, and about the punitive measures that the district court attempted to take until this court intervened on mandamus review. We felt that all that was enough to create an appearance of impropriety that resentencing was warranted, and that was all briefed before we got the government's letter and submitted it to the court. So just to clarify, against the facts, did your client actually, has he served any of the time? He has not yet. So there's been no voluntary service. I see. So that's all lying in the future. That's right, and he was sentenced to five months incarceration, five months home incarceration. On remand from this court, Mr. Huberfeld, who my client cooperated against, was sentenced to seven months. So there's a disparity. From 30 months, right? Correct, correct. And, but in this case, the judge actually departed downward in giving your client the five months, but it was on the 5K motion. That's right, right. He very downward, departed downward on the 5K motion. But still, Mr. Rechnitz now has a roughly equivalent sentence to Mr. Huberfeld. And that will be for the, I hope, for the next district judge to assess and evaluate along with the other 35, 50, 50. And just to sort out the timing, I understand then, I think this is correct, that the district court's interaction with Mr. Kaplan predated the sentencing of your client. It was just that the disclosure happened after the initial imposition sentence? That is, that is right, Your Honor. Yes, that's correct. And then the restitution followed. Correct, correct. Okay, I just want to get the sequencing right. And I think, I think I neglected to ask the government to just, if I can ask, to confirm a couple questions that I had asked counsel for the appellant. I'd just like confirmation, if you know about the state of the record in the Eastern District, do you know when or if there is a sentencing schedule for Mr. Kaplan? Last I checked, there was not. The DACA number is actually in Koba's brief. It's 16-624. All right, so we don't know that. Right. And are you aware of whether Koba has requested restitution from Kaplan or any of his co-defendants in that case? I'm not aware. You're not aware of one or the other? Right. Okay. All right. I don't think we have anything further. Thank you both very much for your arguments in this very challenging case. We will take the case under advisement. We have now completed the day calendar. There are no motions. So we will now stand adjourned. Thank you very much.